Thank you, Your Honor. If it may please the Court, Peter Bertrand, Buckalter, New York, appearing on behalf of Trustee William Brandt. This case presents significant procedural as well as substantive issues. Although not briefed by the parties, the Supreme Court's recent rulings with respect to the Stern case and the executive benefits case raises significant issues as to whether the bankruptcy court had the jurisdiction to enter a final judgment in this case, notwithstanding the parties' consent. As the Court is well aware, in Stern, the Court found that Article I judges were not vested with the jurisdiction to enter final rulings or judgments in various cases arising under state law. In this case, the fraudulent conveyance claims arose under state law. And in the executive benefits case, although In re. Bellingham went up to the Supreme Court and found alternate bases by which a bankruptcy court could enter an order of recommendations to be then reviewed de novo by the district court, or if consent were granted, the Supreme Court in the executive benefits case held only with respect to the former and not as to the latter. So that's an open issue. We submit that at a minimum, given that the district court, on the face of its opinion, stated that its review was for abuse of discretion, not de novo, we submit that at a minimum the matter should be referred back to the district court for review. Are you familiar with Mastro v. Rigby? I'm not. That was recently decided. And I think the import of that case is that Bellingham, that Bellingham's decision in the Ninth Circuit still remains good law as to consent. Assuming that that case is as represented, I think, is there anything left of your argument on jurisdiction? No, Your Honor, other than given that the Supreme Court left that open, we submit that's an issue. All right. Going to the substance of the case, the legal issue presented here is whether NVIDIA is entitled to retain a $38 million windfall that it received in connection with this transaction, notwithstanding the bankruptcy court's determination that 3DFX transferred all tangible and intangible assets related to, used in, and or material to the conduct of 3DFX's graphics business. The bankruptcy court further found, and NVIDIA admitted, that the primary purpose of the transaction was to enable them to acquire 3DFX engineers, and NVIDIA admitted that it would have been impossible to acquire these engineers absent the deal structure. The undisputed evidence further showed that NVIDIA never offered less than $100 million, and, in fact, the bankruptcy court had issued a partial, an order on a motion for summary judgment where it held that NVIDIA was estopped from claiming that the value of the assets were less than $108 million. And although the order itself talked about transaction value, if the court looks to the express language of the summary adjudication order, what the court says is the transaction value as used in the notification. And the court, prior to making that determination, on equitable estoppel, went through the CFR regs in terms of what was required to be reported on that notification. In particular, what was required to be noted on the notification was the fair market value of the assets. And fair market value means objectively determined value. It does not mean that it's a subjective value, as urged by NVIDIA in the court below. For purposes of my question, let's assume that that's not the basis for estoppel, and so you've got to establish by other means what the fair market value was. And let's look at the acquisition of the engineers. I think you're stating the record accurately when you say that a primary purpose, maybe the primary purpose of entering into the transaction, was for NVIDIA to get its hands on these engineers, which appeared to have been valued quite over and above the salary, like sort of trading value for a baseball player at a little over a million dollars per. I got that. The question, however, is under a case law, are they an asset? And as I read our cases, they aren't. Okay. Very good, Your Honor. Let me address that. We believe that the workforce in place is an asset that was transferable under Robinson, under Glossband, and under the definition of property under the Bankruptcy Code, Section 541. But let me make sure I've got my facts straight. Sure. The company dissolves, fires the employees, terminates the employees. NVIDIA comes in and offers to some of them, I think about 122 of them, not all of them, jobs with a signing bonus and an increase in salary. None of them is required to take the job. It's not such as, you know, the company just changes the name on the door, and the people that came in on Monday are the same ones that came in on Friday. Only part of the workforce is recruited. Only part of the workforce that is recruited comes, and the incentive for coming is more than they're paid previously. That, on our case law, doesn't sound to me like it's a purchase of an asset. Okay. And let me address that. And I also want to make clear I want to reserve five minutes for rebuttal. Manage your own time, though. Yeah. All right. Thank you, Your Honor. Going to the issue that you pose, the rights associated with the engineers were specifically contemplated in connection with the APA itself. In particular, the engineers, it's not just a conveyance of a person, but the engineers embody the know-how. Oh, sure, that's why they're valuable, and I get that, yeah. Correct. And here, the purpose of the transaction, just as in the Glossman-Robinson case, was the provisions in the APA specifically required that 3-D effects maintain the employees, provided rankings, provided salary information. They were not terminated until 3-D effects could come in and make a presentation with respect to them so that they could be first in line. And at the time, engineers were highly sought after. They were viewed as highly valuable assets. And NVIDIA, in its negotiations with 3-D effects, specifically negotiated the right to have this access, to be first in line, to acquire the engineers, the engineering talent, and the associated intellectual property. Yeah, no, I understand all of that, but it seems to me that our holdings in Atkinson and REO tell us that this is not a transfer of an asset within the meaning of the bankruptcy law. And I'd like to address that straight up. We believe that neither Atkinson or REO are controlling, as the bankruptcy court found, in Atkinson and REO, there were a couple of very significant differences. Number one, those cases were successor liability cases. Number two, the object of those transactions was not to acquire workforce. In fact, in this case, the transaction was structured solely for the purpose of acquiring a workforce. In Atkinson and in REO, that was not true at all. In fact, in REO, the employees contacted the buyer completely independent of it. That's not what the structure was. And, in fact, if, as the court said, you look at the fair market value negotiated by the parties, why wasn't 3-D effects paid the full consideration? The only reason that 3-D effects was not paid the entire consideration was because NVIDIA and the management of 3-D effects negotiated a transaction whereby the stock would not be paid unless the creditors agreed to take a haircut to the benefit of the very managers and insiders who were negotiating the deal. That's the only reason why the full purchase price was paid. This price, NVIDIA was a sophisticated party. It had legions of deal professionals. It understood what it was getting. You don't have to list the engineers in order to NVIDIA to have been able to calculate its risk and likelihood of being able to acquire these engineers, which under the NDA, they were prohibited for six months from even being able to come with respect to the engineers. So I respectfully submit, Your Honor, that contrary to Atchison and REO, those were completely different elements that had to be proved for successor liability, and the purpose of neither one of those transactions contemplated acquiring the employees. You're down to about four minutes. If you're reserved. Thank you, Your Honor. Yeah. Good afternoon, Your Honors. Robert Varian and Karen Johnson McEwen for NVIDIA. You know, in listening to the argument that we just heard, I'm reminded that all of these arguments, every last one of them, were made in two forms below. First, they were made in the very lengthy trial in the bankruptcy court. They're the subject of very careful and thoughtful attention in an 87-page opinion by the bankruptcy judge, which deals with every one of these issues in a very thoughtful, thorough way, weighing the evidence, addressing each of these arguments specifically, and rejecting each one of them. Second, they were addressed all over again in the district court because, of course, you have a right to an appeal in the district court from a bankruptcy adversary proceeding. If that argument by itself were sufficient, we would never be reversed by the United States Supreme Court. And we would never reverse a bankruptcy court in the district court. Well, here's the point then. There is no contention at all in this case that any of those findings, any of them, was not supported by substantial evidence or was clearly erroneous. You can read the brief. Well, I don't think there's actually much disagreement as to the facts. The disagreement is over to the consequence of the facts. Well, no, Your Honor. A lot of the facts that we just heard are not facts at all. And, moreover, I think the point is that the facts are not facts. You mean some of the things that I said aren't facts? No. Everything you said was completely factual. But we heard some other things that strayed a little bit from the facts. And, you know, this is advocacy, and we had the advocacy process, you know, twice. We had it, as I said, in a lengthy trial, lots of evidence. All of that evidence was weighed, and it was overwhelming. It wasn't close. It was overwhelmingly against the trustee in the trustee's case. And then, again, before Judge White, we went through the whole process a second time. But here's my problem with the case. And now I'll give it from the other side as my problem. Clearly, NVIDIA gets something of value when it gets access to these engineers, and they're willing to pay quite a bit for it. Yet both the bankruptcy judge and the district judge say they're not assets within a relevant, meaningful purposes of valuation here. That's counterintuitive. It's something that they valued. It's something they paid money for. But it's not an asset in terms of valuation, in terms of what 3VFX had a right to expect in return for entering into the deal. Yeah. There are several points that are, I think, embedded in Your Honor's question and point and observation. First, Your Honor's points and analysis under the Atchison-Topeka case are exactly right, but I want to take a step back from that. They're not assets in any way, shape, or form under the facts and circumstances of this case, and I'm happy to address that. But beyond that, Your Honor, there are factual findings, uncontested and, frankly, uncontestable. I mean, they are clear. They are supported by voluminous evidence. They are discussed at length in this 87-page opinion and, again, to some extent in Judge White's opinion following. And those findings, I didn't think I was going to need to recite here because there's no dispute about any of them. But let me rattle through a couple of them for you. There was no workforce at the time of the transaction. There was no transfer of a workforce or an attempt to transfer a workforce. And I can go through the evidence. It's massive on this. The question is somewhat different, which is assume if it had been a straight merger or purchase of stock, the employees would have remained with the company and presumably that had some value. Here was an asset purchase, and you're quite right. The employees were no longer working for the company. But there is something of value to the acquisition. NVIDIA did receive something of value, and I struggle with how that fits into the bankruptcy scheme in terms of being under stigma. Let me see if I can address that point directly. So first, it's not an asset, and it has to be an asset. It has to be property of the debtor. There are the fraudulent conveyance laws that are adopted under the bankruptcy code. It's got to be property of the debtor to be an asset. It has to be something that is transferred and has to be something that's subject to levy under a judgment. So the district court, and really it was the bankruptcy court's findings on this, I think are critical in terms of that analysis. So it's not an asset first under Addison-Topeka, very clear. But more than that, much more than that, there was no transfer. There was no attempt to transfer. The evidence was uncontradicted that 3DFX could not, if it really wanted to, if it had tried to transfer a workforce, and of course we didn't have a workforce. There's a finding on that, too. But if that's everything that was intended and everything they tried to do, they couldn't do it. And they said so. There's clear testimony on this that they were about to go out of business, that there had been a rivalry between 3DFX and NVIDIA that went way back, that Jensen Wong, the founder of NVIDIA, was referred to as Darth Vader and the Great Satan there. And, you know, the two most senior people at 3DFX testified, there's no way that we thought they would ever agree to go to work for NVIDIA in light of that. And the NVIDIA testimony was the same. Yes, Mr. Wong thought that this was something that could be accomplished. He was bold in thinking that he could persuade people after the deal. And there was a lot of disagreement about whether that was even doable. But let's see what happened. You know, first you look at the asset purchase agreement. There's nothing whatsoever that refers to the engineers, the transfer of engineers. It doesn't say, and there are findings on all of this, and we can go back and read the agreement, it doesn't say that 3DFX has to provide any assistance of any kind in recruiting. The information that was provided about the engineers was made or given before the offer was even made. It wasn't part of the agreement. So the agreement doesn't purport to transfer anything, nor could it possibly have. Nor could it possibly have. Uncontradicted evidence on all of that. And so what the record also shows, and, again, there are findings on this, and I'm really, you know, not as well prepared as I might be to go through all the evidence because I thought we were well past that, and it was a different argument that was being made here. But let me see what I can do on that subject off the top of my head. So after the deal, there are no offers until at least three days after the deal is signed. So the employees are terminated, and the uncontradicted evidence is they were going to be terminated, the company was out of cash, they couldn't meet their payroll, they were done. No issue about that. So after this is signed, they're terminated, which was inevitable. And, again, the transaction price is exactly the same, whether NVIDIA, through its own efforts, is successful in recruiting every last one of the engineers that it's interested in or none of them. It doesn't change. Now, what happened, and, again, Judge O'Frensky's opinion is very clear on this, and there's no real dispute about it, is Jensen Wong and others actively recruited these engineers, and they recruited them with money, they recruited them with stock option promises, they recruited them with promises of immediate vacation, and, most importantly of all, they recruited these engineers by telling them, look, you will have great things to work on here at NVIDIA. We have this product roadmap that's fantastic, and you really should come work with us. And, yes, it turned out, after the fact, that Mr. Wong was very persuasive and largely successful. But it wasn't preordained. It didn't have to come out that way. And the reason it came out that way had nothing to do with any transfer of any assets at all. Now, did NVIDIA value certain things? It might have had anything to do with the transfer of assets, depending a little bit on what you mean by had to do with, but part of the understanding, part of the deal was that NVIDIA would have early access to these employees and the opportunity to engage in the pitch, which turned out to have been successful for about 100 of the engineers. That was negotiated for and delivered, this access. No, Your Honor. Respectfully, that was, I'm sure, discussed. The access was not negotiated? No. I mean, it's not in the agreement. There's nothing in the agreement that says we'll have access. There's nothing in the agreement that says you need to help us recruit people. There's nothing in that. There's a very specific finding on that, again, in the record below. But there's nothing in the agreement. We can all read the agreement. It isn't there. Now, did NVIDIA expect to be in a better position to recruit people to make the pitch that I just talked about?  I mean, there's no doubt about that. But that's not an asset, Your Honor. That's not something you can transfer and wasn't transferred. It's not property. It's not something you could levy upon. It's not something that depletes the bankruptcy estate in any way, shape, or form. It just doesn't fit within the framework of the fraudulent conveyance statute. Let me ask you about the SEC. I mean, I recognize that for evaluation purposes, you're looking at different accounting standards gap and the like under the SEC. But there is a statement in there that basically says that the company acquired a going concern, including a workforce. So apart from how one might value that, what do we make of that statement? Yes. Well, Your Honor, again, not surprisingly, that statement was addressed at great length below. And it's addressed in detail. All of that language is quoted in the opinion of Judge Afremsky. Right. And it's explained. There's a lot of testimony about it. And, you know, the bottom line, I'm not going to recite all the testimony at this point, but the bottom line is that it was clear that those statements were made for accounting purposes. The statement begins, for purposes of EITF 98-3, we were a business. Now, the testimony showed that it was for that purpose only. It was all driven by that accounting provision. And there was expert testimony that said, you know, that really probably wasn't the right approach. But in any event, it was all based on accounting considerations under this EITF 98.3. A lot of testimony about that. A lot of evidence considered very carefully. And, you know, a judge ---- I understand that. That's what they're saying. But this isn't really a statement of an accounting. It's a statement about what was acquired. Now, you've mentioned before, well, you don't really see it in any of the agreements. You don't see it in the documents, the transaction documents. But it is here that they acquired a workforce. Yeah. And, Your Honor, let me ---- That just doesn't prove? No. It's not true. Okay. They didn't acquire. Right. The findings are there was no workforce. And there were specific findings on each of those points at trial. And I can provide a citation if that's helpful. But, you know, each of those little components that are under EITF 98.3, I think it is that point, each of those was the subject of lots of testimony, and none of those were true. And, in fact, that was all driven by EITF 98.3. And that's the reason. They weren't, per se, accounting statements, but they were made only for purposes of accounting, as the statements themselves say explicitly. And the testimony was that they didn't line up with the real-world reality. It was driven by the fact that NVIDIA paid so much more than the assets themselves, the property that could be transferred and was transferred were worth, that there was all this goodwill. It was a plug number. There was nothing left to assign it to. And that triggered some analysis by pointy-headed accountants that got them to 98. Yeah. But it's more than that. I mean, when you say it's only for the purposes of accounting, it sounds like, well, for the purposes of the bankruptcy schedules, this number was invented. I mean, it's the same different, different, obviously different forms. But, I mean, it does mean something. Yeah. What it means, Your Honor, and, again, this is a finding, and it's supported by more than substantial evidence everywhere you look, is that NVIDIA overpaid for the assets that are subject to the fraudulent conveyance transfer. And it did that for reasons unique to it, strategic value. Yes, Your Honor, having an opportunity, not negotiated for, not in the agreement, not contractual, but having the ability to be in a position after the fact to recruit with your own pitch, your own money, your own promises, your own consideration, these engineers, some of them, no workforce, who were going to be terminated, no doubt about that in any event. And that's the Atkinson Topeka case. And the fact that it's a successor liability case makes no difference. The analysis is exactly the same. That case was decided under the fraudulent transaction element of successor liability. And the issue, as the Court made very clear both in the opinion, both opinions below, that the issue was, you know, yes, we came afterwards and we hired these employees. And in that case, they hired 60% of all the employees. They hired everybody who had the relationships with the clients. And all of the business followed because they hired those folks, those people with the client relationships. So they hired almost all of the workforce and all of the key people and got all of the business. And in that factual context, again, was there fair value and consideration paid for the assets? This Court said that, no, they're not assets. And I could quote it. Your Honors can read it. I'm sure you have or will. It said, yes, they recruited them. And the fact that they were able to recruit them rather than having these employees go somewhere else to another employer is just irrelevant to the fraudulent transaction analysis, which it is. And, again, Your Honors, this, all of this, all of these issues, all of these points were the subject of voluminous testimony at trial. And they're all discussed. The evidence was weighed carefully in that decision. And there's no reason to re-weigh any of that evidence here. There's not even an allegation. It's a very different argument that's being made here, which I haven't gotten to yet because we're talking about these other things, which is fine because I'm here to talk to you about what the Court is interested in. But, you know, there's no appeal, no assignment of error as to any of those factual determinations, none of them. There's no argument that they were not supported by substantial evidence, that they were clearly erroneous. So all of those, every last one of them, stands. And for good reason. I mean, you couldn't come into this Court and make a credible argument that there's no substantial evidence. It's just not available. So what we've seen instead is a couple of arguments that are flatly contradicted by the record, that the summary judgment order was something different from what it actually was, that there was some kind of an admission made before the SEC, this is Your Honor's point, that somehow should have been binding. Of course, it couldn't have been binding. And the Court took all of the evidence, considered all of the evidence, and said the real-world evidence of what the value was, the real value, not accounting concepts, not statements made for purposes of fitting into an accounting model, which was probably wrong, is what the Court was charged with doing, and it did just that, and explained it quite carefully. So... Thank you, Counsel. Thank you, Your Honor. Thank you, Your Honor. First off, going to one of the questions that was asked with respect to the representations that were made about what was acquired, those statements were statements of fact. They were made under oath. They were completely disregarded by the Bankruptcy Court. He gave them no effect whatsoever. That's the first thing. The second thing is, is that it's well established that the Court is to look at the substance of the transaction and honor substance over form. And Counsel stands up and says, well, you know, it's not in the APA that this was going to happen, and it's not in the APA that that's going to happen. How is it that NVIDIA shows up the very day that the sale is announced and hands out, with determinations, offer letters to all of the employees? They meet at NVIDIA's office, at 3DFX's offices. They do their pitch. They have employment packages ready there for the employees. And then they say, oh, the employees weren't part of this at all. Now, you know, part of it is in a more simplistic analysis. It's kind of like the value of a real property, which may be more valuable to a neighbor than the fair market value. Isn't that the – that's what this looks like in a sense. Acquisitionist company, NVIDIA may have overpaid for the opportunity to acquire the employees, but that doesn't necessarily impact fair market value, which looks at the market as a whole. Well, what I would say with respect to that, Your Honor, is the following. Number one, NVIDIA was very sophisticated. Its analyses valued engineers at between a million and a million and a half dollars, the Morgan Stanley analyses that they did. That's the first thing. The second thing is, is that while there was a claim that this somehow strategic value, in fact, in that industry, engineers were highly valued. They were graphics chips engineers. The vast majority of 3D effects involved a board business. So the crux of what the value in 3D effects was were the very engineers, and they got the best of the best world-class engineers. Additionally, what I would say with respect to that is under the bankruptcy court's formulation, the best evidence of value is what the parties agreed to in an arm's-length transaction. And in this transaction, NVIDIA weighed what the risk was in terms of its likelihood of getting the employees, of which it got 90 percent of. It had employees in the APA the night before and, in fact, in the final APA signed under Section 2.16 and 4.2. There are all kinds of covenants and requirements with respect to 3D effects, maintaining the employees, keeping them employed, representations and warranties, about what they could and could not do. So the notion that employees were completely separate and the notion that the intellectual property associated with these employees was not an asset, that creditors were not entitled to be paid, I submit, is nonsense. And, in fact, even under a circumstance where there is a sale of a business, there's nothing that requires that the employees stay once the buyer acquires it. But that seems to be their argument. Well, it's an asset sale. Therefore, we have to look at this completely different. And, in fact, their expert, Mr. Murphy, testified, and this was not contradicted, this is undisputed in the record, that what you do in this circumstance to get an assembled workforce is you sign an asset purchase agreement, you fire the employees, and the acquiring company that's acquiring the assets immediately comes in and hires. It's the fire and rehire scenario, which is exactly what happened here. And, lastly, why wasn't 3DFX paid the full amount of the agreed-upon consideration? The only reason that 3DFX was not paid the full amount of the consideration was that 3DFX could not cram down its creditors to $95 million. It was negotiated in by the insiders, the management. Now, why does who gets paid have any bearing on the value of what's transferred? And Jensen Wong and other NVIDIA witnesses admitted that who got paid doesn't have any impact on the value of what was being transferred. So we respectfully submit that the bankruptcy court said there's no value, whether it's the right of access, whether it's the rankings, whether it's the ability to be first in line, whether it's the waiver of the rights that 3DFX had under the NDA not to make the employees available to them. And those were all rights, those that are property under the bankruptcy code that the court ignored. Thank you very much. Thank you, counsel. Thank you both for your arguments. We realize that we didn't get to some issues, but they're well briefed, and I think we have them in hand. Thank you very much.
judges: Thomas, McKeown, Fletcher